UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-80977-CIV-MARRA

JACK T. KRAUSER, D.M.D.,

      Plaintiff,

v.

EVOLLUTION IP HOLDINGS, INC. and
BIOHORIZONS IMPLANT SYSTEMS, INC.,

      Defendants.

_____/

## OPINION AND ORDER

    This cause is before the Court upon Defendants' Joint Motion to Dismiss or Transfer (DE 45). The Court has reviewed the briefs and the record, and is otherwise advised in the premises.

## I. Background

    This case involves competing claims of ownership and inventorship of a dental implant system. Plaintiff Jack T. Krauser, D.M.D. ("Dr. Krauser") is a noted periodontist and implant surgeon, a lecturer, author, and educator, and a consultant to several major dental implant companies. He alleges that he "first conceived" the dental implant system in question in 1987. (DE 35: Am. Compl. ¶ 11).[1]

    In 1988, Dr. Krauser retained a medical job and machine shop to produce drawings and manufacture prototypes of the system, including implants, attachments, and related products. (Am. Compl. ¶ 12).  To assist the shop in performing its work, Dr. Krauser provided the shop with written

---

[1] Dr. Krauser was ultimately granted patent number 5,316,476 for a "Dental Implant with a Longitudinally Grooved Cylindrical Surface." (Am. Compl. ¶ 11). While he claims that he is the sole inventor of the '476 patent, the inventorship of that patent is not at issue in this case.

memoranda, initial drawings and sketches, work product, and intellectual property, including copyrighted materials expressing his ideas in connection with the system. (Am. Compl. ¶ 13). The shop was not manufacturing or selling any dental implant systems of its own at that time. (Am Compl. ¶ 12).

Once the manufacturing process began, Dr. Krauser worked with the shop's principals and employees to develop the system. (Am. Compl. ¶ 14). According to the complaint, "[t]his collaboration included face-to-face communications as part of a broader exchange of documents, sketches, drawings and ongoing discussions pertinent to *in vitro* and *in vivo* animal studies and human clinical evaluations." *Id.* Dr. Krauser alleges that he contributed to the evolution and improvement of the system with his experience in the implant field, his prior consulting with other dental implant manufacturers, his knowledge and ideas gained through giving and attending lectures in the field, "and his thoughts generating further ideas for such improvements." (Am. Compl. ¶ 15).

While Dr. Krauser and the shop's principals and employees developed the system over the next several years, some of the principals and employees applied for and received five patents on different aspects of it. (Am. Compl. ¶ 16).[2] Dr. Krauser was not named as an inventor on the applications, and he now seeks to correct the inventorship of four of the five patents.[3] He alleges that he has a reputational interest in correcting the omission of his name because of his stature in the dental implant field, and he further claims that he has an economic interest in the patents and, by

---

[2] The five patents are Patent No. 5,964,766 ("Buttress Thread Implant"), Patent No. 6,149,432 ("Buttress Thread Dental Implant"), Patent No. 6,406,296 ("Implant with Enlarged Proximal Segment"), Patent No. 6,419,491 ("Dental Implant System with Repeating Microgeometric Surface Patterns"), and Patent No. 6,454,569 ("Dental Implant Having a Dual Bio-Affinity Collar").

[3] Dr. Krauser brings one count for each patent he seeks to correct. He does not seek correction of inventorship for the '766 patent. (Am. Compl. ¶ 19).

2

extension, Article III standing to bring this action. (Am. Compl. ¶¶ 20–21).

This is not the first time Dr. Krauser has initiated an action related to the system. In an earlier case before this Court, Dr. Krauser brought a claim for declaratory relief seeking a declaration that he was both the inventor and owner of the system.[4] He also sought attorney's fees. The inventorship claim was voluntarily dismissed without prejudice, but the Court addressed the remaining ownership claim at summary judgment. The Court concluded that "it is not enough for [Dr. Krauser] to claim ownership of the at-issue intellectual property by stating that the dental implant system incorporates certain features that reflect his ideas. The Court therefore finds, as a matter of law, that [Dr. Krauser] has no ownership rights to the aforementioned intellectual property," i.e., the dental implant system. (Case No. 10-CV-80454-KAM: DE 169 at 20).

In this case, Dr. Krauser seeks an order directing the USPTO to correct the patents by naming him an inventor pursuant to 35 U.S.C. § 256. That statute provides:

> (a) Correction—Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

> (b) Patent valid if error corrected—The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.[5]

---

[4] The defendants in that case were BioHorizons Implant Systems, Inc. (which is a defendant in this action), BioLok International, Inc. (which was manufacturing the system), and their common parent organization BioHorizons, Inc. Dr. Krauser sued the trio alleging that BioLok International had defaulted on obligations set forth in an earlier settlement agreement between it and Dr. Krauser. Among other things, that agreement provided that, in the event of a default, Dr. Krauser could sue for money damages, a declaration of his rights to the dental implant system, or both.

[5] "The term 'Director' means the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office." Leahy-Smith America Invents Act, Pub. L. 112-29, § 2(1), 125 Stat. 284, 284 (2011).

Section 256 "provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent." *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1324 (Fed. Cir. 2009) (citation and internal quotations omitted). The Federal Circuit has interpreted § 256 broadly "as a 'savings provision' to prevent patent rights from being extinguished simply because the inventors are not correctly listed." *Id.* (quoting *Chou v. Univ. of Chi.*, 254 F.3d 1347, 1358 (Fed. Cir. 2001)).

Defendants Evollution IP Holdings, Inc. ("Evollution") and BioHorizons Implant Systems, Inc. ("BioHorizons") move to dismiss Dr. Krauser's inventorship claim on three grounds: first, it is barred by the doctrine of *res judicata*; second, Dr. Krauser is collaterally estopped from asserting any ownership interest in the patents, and his alleged reputational injury is insufficient to establish standing under Article III; and third, Evollution is not subject to personal jurisdiction in Florida.[6] As to this last argument, Defendants request that the Court transfer this action to the District of Delaware—which presumably has jurisdiction over both defendants—as opposed to dismissing Evollution and subjecting Defendants to two lawsuits in two separate venues.

## II. Legal Standards

Defendants move to dismiss Dr. Krauser's claim as barred by *res judicata* under Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss based on *res judicata* is problematic in the sense that *res judicata* is an affirmative defense that requires the Court to look outside of the pleadings, and Federal Rule of Civil Procedure 12(d) instructs the Court to convert such a motion into one for

---

[6] Evollution, which owns the patents at issue in this case, licenses intellectual property (including those patents) to Defendant BioHorizons. BioHorizons sells various dental implant devices and equipment, presumably including the dental implant system at issue here.

summary judgment.[7] But "[a] district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment," *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999)), and the Court accordingly takes judicial notice of the pleadings and documents in Dr. Krauser's first case before this Court (Case No. 10-CV-80454-KAM) as public records, *see Horne*, 392 F. App'x at 802; *see also Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 892–93 (11th Cir. 2013) (comparing complaints from two separate cases to determine whether the same facts were involved for purposes of *res judicata* and ultimately affirming district court's dismissal under Rule 12(b)(6)); *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1184–85 (affirming district court's dismissal on grounds of *res judicata* under Rule 12(b)(6)). Consequently, Defendants' 12(b)(6) motion will not be converted into a motion for summary judgment.

## A. Motions to dismiss under Rule 12(b)(6)

Rule 8(a) of the Federal Rules of Civil Procedure "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to give the defendant fair notice of what the plaintiff's claim is . . . and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

---

[7] Rule 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

(citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009). Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1950. When considering a motion to dismiss for failure to state a claim, the court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010) (internal quotation marks omitted).

## B. *Res judicata* **and the declaratory judgment exception**

As to *res judicata*, the Eleventh Circuit has held that,

[a]s a general rule, res judicata bars the filing of claims which were raised or could have been raised in an earlier proceeding. A party asserting res judicata bears the burden of showing these elements: (1) the prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action. Only if all four of those requirements are met do we consider whether the claim in the new suit was or could have been raised in the prior action; if the answer is yes, res judicata applies.

*Dormescar v. U.S. Atty. Gen.*, 690 F.3d 1258, 1268 (11th Cir. 2012) (citations, quotations, and notes omitted); *see also Lobo*, 704 F.3d at 892–93; *Davila*, 326 F.3d at 1187. "In determining whether the prior and present causes of action are the same, [the Court] must decide whether the actions arise 'out of the same nucleus of operative fact, or are based upon the same factual predicate.'" *Davila*,

6

326 F.3d at 1187 (quoting *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1297 (11th Cir. 2001).

In the Eleventh Circuit, however, a declaratory judgment exception to *res judicata* has been adopted; thus, ordinary principles of res judicata are not applied to declaratory judgments provided that declaratory relief was the only relief sought in the prior action. *See Empire Fire & Marine Ins. Co. v. J. Transp., Inc.*, 880 F.2d 1291, 1296 (11th Cir. 1989); *see also Duane Reade, Inc. v. St. Paul Fire & Marble Ins. Co.*, 600 F.3d 190, 196 (2d Cir. 2010) (citing 18A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4446) ("So long as the request for declaratory relief is combined or followed with coercive relief, the claim-preclusion rules that apply to actions for coercive relief apply with full force."). As held in *Empire Fire*, the supplemental nature of declaratory relief "requires that preclusive effect can only be given to relitigation of any issue *actually* litigated and necessary to the judgment rendered." *Empire Fire & Marine Ins. Co.*, 880 F.2d at 1294–97 (emphasis in original) (adopting the rationale of the former Fifth Circuit in *Kaspar Wire Works, Inc. v Leco Eng'g & Mach., Inc.*, 575 F.2d 530 (5th Cir. 1978)).[8] In other words, "the preclusive effect of a prior declaratory proceeding should be viewed, within the usual framework of res judicata, as presenting a special problem of issue preclusion." *Id.* at 1296; *see also Magaldi v. Safeco Ins. Co. of Am.*, No. 10-80280-CIV, 2010 WL 2542011, at *3 (S.D. Fla. June 22, 2010) ("Under the declaratory judgment exception to the [claim preclusion rule], the preclusive effect of a declaratory judgment is limited to the subject matter of the declaratory relief, with the rule of preclusion prohibiting only relitigation of any issue *actually litigated* and necessary to the judgment rendered in the first filed suit.") (citations omitted) (emphasis in original).

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Issue preclusion, otherwise known as collateral estoppel, applies when the issue at stake is identical to the one involved in the prior proceeding and the issue was actually litigated and decided in the prior proceeding. *See Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1080 (11th Cir. 2013) (citing *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998)). Moreover, "the issue must have been 'actually litigated and resolved in a valid court determination essential to the prior judgment.'" *Id.* (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)).

### III. Analysis

As previously indicated, in the prior action between the parties Plaintiff asserted, and then voluntarily dismissed, his inventorship claim. As a result, Defendants argue that all four elements of *res judicata* have been established in this case. Defendants further assert that because Dr. Krauser sought both declaratory *and* coercive relief in the prior action, the declaratory judgment exception to *res judicata* does not apply. (The latter relief being in the form of Dr. Krauser's request for attorney's fees). Dr. Krauser responds by arguing that his request for attorney's fees did not constitute coercive relief, so the declaratory judgment exception applies and renders the preclusive effect of the prior action limited to the subject matter of the declaratory relief, i.e., ownership (or lack of ownership) of the patents at issue. Hence, the fact that Dr. Krauser is estopped from asserting *ownership* does not prevent him from seeking correction of inventorship. He also asserts that his reputational interest in correcting inventorship is sufficient to confer Article III standing.

### A. *Res judicata* and the declaratory judgment exception

As a threshold matter, application of the declaratory judgment exception in this case requires a determination as to whether Dr. Krauser's request for attorney's fees in the prior action constituted "coercive relief." As in the prior action, the Court applies Florida contract law to construe the

agreement that entitled Dr. Krauser to initiate the prior action, *see supra* note 4, because whether Krauser's request for fees constituted coercive relief is a substantive issue of contract interpretation, i.e., an issue of how integral the fees are to the merits of the case and the scope of relief. *See Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1285 (Fed. Cir. 2012) (recognizing that construction of pattern assignment agreements is a matter of state contract law); *see also In re Chira*, 567 F.3d 1307, 1312 (11th Cir. 2009); *Krauser v. BioHorizons, Inc.*, 903 F. Supp. 2d 1337, 1349 (S.D. Fla. 2012) (citing *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1370 (Fed. Cir. 2008)).   In Florida, the recovery of attorney's fees is ancillary to the substantive claim within which the fees are sought. *See Cheek v. McGowan Elec. Supply Co.*, 511 So. 2d 977, 979 (Fla. 1987) ("the recovery of attorney's fees is ancillary to the claim for damages. A contractual provision authorizing the payment of attorney's fees is not part of the substantive claim because it is only intended to make the successful party whole by reimbursing him for the expense of litigation."); *First Specialty Ins. Co. v. Caliber One Indem. Co.*, 988 So. 2d 708, 714 (Fla. Dist. Ct. App. 2008) ("Florida courts have held that attorneys' fees are not damages. Attorneys' fees are ancillary to damages, and are not part of a substantive claim.") (citations and internal quotations omitted); *Scottsdale Ins. Co. v. Haynes*, 793 So. 2d 1006, 1009 (Fla. Dist. Ct. App. 2001) ("It is generally held that attorney's fees are not damages, but are ancillary to damages, and are not part of a substantive claim."); *see also Schafler v. Fairway Park Condo. Ass'n*, 324 F. Supp. 2d 1302, 1311 (S.D. Fla. 2004) (concluding that, in the context of an *Erie* analysis, "the issue of attorney's fees is ancillary to the underlying cause of action. Parties are not likely to engage in forum shopping with respect to ancillary issues at the time the cause of action is initially filed."); *Screnci v. State Farm Mut. Auto Ins. Co.*, No. 09-80510-CIV, 2009 WL 3667091, at *4 (S.D. Fla. Oct. 26, 2009) ("Florida law is clear that the recovery of attorney's fees is ancillary

9

to substantive claims for relief.") (citations omitted). Thus, the Court has little trouble concluding that Dr. Krauser's request in the prior action for attorney's fees, i.e., "ancillary relief" as defined by Florida law, does not constitute a request for "coercive relief." As a result, the declaratory judgment exception is applicable in this case. And because the exception applies, the preclusive effect of the Court's declaration in the prior action is limited to the subject matter of the declaratory relief. The subject matter of that relief addressed Dr. Krauser's lack of *ownership* in the patents at issue. No party can dispute that the issue of ownership was actually litigated and necessary to the judgment rendered in the prior action, barring Dr. Krauser from relitigating that issue here.

But Dr. Krauser now brings a claim for correction of *inventorship* under 35 U.S.C. § 256, and it is well established that ownership and inventorship are separate issues because "inventorship is a question of who actually invented the subject matter claimed in a patent. Ownership, however, is a question of who owns legal title to the subject matter claimed in a patent, patents having the attributes of personal property." *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993) (citing 35 U.S.C. § 261); *see also Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256, 1264 (Fed. Cir. 2007) (citing *Beech Aircraft Corp.* approvingly). Notwithstanding the distinction between the two, Defendants argue that Dr. Krauser lacks Article III standing to bring his inventorship claim because he is collaterally estopped from asserting any ownership interest in the patents. This lack of ownership interest, according to Defendants, deprives Dr. Krauser of any financial interest in the patents and, by extension, any economic interest that might confer standing under Article III. Dr. Krauser responds by asserting that the "reputational" injury he would suffer by not being named an inventor on the patents at issue meets Article III's requirements.

10

### B. The "reputational interest" theory of Article III standing

Whether a purely reputational interest confers standing for a § 256 claim is an open question in the Federal Circuit. On at least two occasions that court had an opportunity to resolve the issue, and on both occasions the court left the question unanswered. *See Chou*, 254 F.3d at 1359 (reserving decision on whether a reputational interest alone is enough to satisfy Article III's standing requirements); *see also Larson*, 569 F.3d at 1328 ("we need not answer the question we left open in *Chou*—whether a purely reputational interest is sufficient to confer standing for a § 256 claim—because the issue is simply not presented by these facts."). For the reasons that follow, this Court answers the open question and holds that a purely reputational interest is sufficient to confer standing for a § 256 claim.

Of course, whether a plaintiff seeking correction of inventorship under § 256 has Article III standing is a threshold question, "determining the power of the court to entertain the suit." *Larson*, 1319 F.3d at 1325–26 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). The plaintiff can pursue the inventorship claim in federal court "only if the requirements for constitutional standing—namely injury, causation, and redressability—are satisfied." *Id.* at 1326.

In *Chou*, the first of the two cases to address the unique standing issue before the Court, the Federal Circuit made the following observation:

> [the plaintiff] argues that a reputational interest alone is enough to satisfy the requirements of Article III standing. That assertion is not implausible. After all, being considered an inventor of important subject matter is a mark of success in one's field, comparable to being an author of an important scientific paper. Pecuniary consequences may well flow from being designated as an inventor. However, we need not decide that issue because [the plaintiff] has alleged a concrete financial interest in the patent, albeit an interest less than ownership.

*Chou*, 254 F.3d at 1359; *see also Jardin v. Datallegro, Inc.*, No. 10-CV-2552-IEG (WVG), 2011 WL

3300152, at *8 (S.D. Cal. July 29, 2011) (citing *Chou* for the proposition that "[t]he attribution of inventorship confers value other than purely economic benefits."). In *Larson*, the second of the two cases, the Federal Circuit again left the question open because the court concluded that the plaintiff had failed to claim a reputational injury, so a reputational injury could not be a basis on which to find standing. *See Larson*, 569 F.3d at 1327–28; *see also Vita-Herb Nutriceuticals, Inc. v. Probiohealth, LLC*, No. SACV 11-1463, 2013 WL 1182992, at *4 (C.D. Cal. Mar. 20, 2013) (reserving resolution of the question of standing based on reputational injury because, similar to *Larson*, the plaintiff conceded that it did not seek reputational damages).

Here, Dr. Krauser alleges that, given his stature in the dental implant field, "he has a reputational interest in correcting the omission of his name and, therefore, evidence of his contributions to each of the patents which are the subject of this action." (Am. Compl. ¶ 20). He separately alleges that he has "an economic interest in each of those patents and standing to bring this action." (Am. Compl. ¶ 21). Unlike *Chou*, Dr. Krauser has not alleged any concrete financial interest in the patents at issue. And unlike *Larson*, he has alleged a reputational injury.

Since *Larson* and *Chou*, district courts addressing this issue have come to opposite conclusions. Some courts have rejected the "reputational interest" theory of standing because "bald assertions" of reputational interest are insufficient to carry the plaintiff's burden of proof, *see Cole v. Gummow*, No. 3–02–CV–0705–BD(P), 2003 WL 22455387, at *3 (N.D. Tex. Oct. 22, 2003), and because being designated an inventor does not necessarily constitute "a mark of success in one's field," *see Barnette v. Dicello*, 616 F. Supp. 2d 709, 714 (N.D. Ohio 2007) (citing *Cole* approvingly). Moreover, one court effectively rejected the theory by concluding that even if the plaintiff could establish standing based solely on injury to reputation, her claim failed as a matter of law because

12

she provided no evidence (such as lost employment opportunities) to support injury to reputation. *See Hoang v. Abbott Labs.*, No. 08 C 189, 2009 WL 1657437, at *3 (N.D. Ill. June 12, 2009).

On the other hand, one court concluded that, at the motion to dismiss stage, a plaintiff had standing to challenge inventorship under § 256 "due to potential harm to his reputational interests." *Shukh v. Seagate Tech., LLC*, Civil No. 10-404 (JRT/JJK), 2011 WL 1258510, at *8 (D. Minn. Mar. 30, 2011). But that court also considered the plaintiff's allegations that he was having trouble finding new employment and noted that "it is . . . logical that omission from important patents could affect his ability to get a new job," *Id.* at *7, and in any event the court ultimately granted the defendant's motion for summary judgment because, while a general allegation of reputational injury was sufficient to survive a motion to dismiss, the plaintiff failed to come forward with evidence of damage to his reputation to survive summary judgment. *See Shukh v. Seagate Tech., LLC*, Civil No. 10-404 (JRT/JJK), 2013 WL 1197403, at *3–*13 (D. Minn. Mar. 25, 2013).[9] Another court similarly concluded that, at the motion to dismiss stage, a plaintiff had standing because he alleged that he suffered harm to his reputation and standing in the scientific community and that, as a result, he was unable to secure an employment opportunity and earn a particular salary. *See Czarnik v. Illumina, Inc.*, 437 F. Supp. 2d 252, 256 (D. Del. 2006). Consistent with *Shukh*, however, the court in *Czarnik* noted that to survive summary judgment the plaintiff would be required to "set forth by affidavit or other evidence specific facts establishing standing." *Id.* at 256 n.2 (citation omitted).

While courts have come to different conclusions as to the soundness of the reputational interest theory of standing, no court has provided a rationale for its conclusion other than a value

---

[9] This conclusion was due in large part to the plaintiff's deposition testimony, where he essentially conceded that he "did not lose standing or prestige in his field and did not suffer a loss of reputational benefits associated with inventorship" when the defendant omitted his name as an inventor on the six disputed patents. *Id.* at *10.

judgment as to the significance (or lack of significance) of a man's interest in his reputation. Yet

there is a body of law devoted to this very issue.

### i. A brief overview of the history of defamation law

"Since the latter half of the 16th century, the common law has afforded a cause of action for

damage to a person's reputation by the publication of false and defamatory

statements. . . . Defamation law developed not only as a means of allowing an individual to vindicate

his good name, but also for the purpose of obtaining redress for harm caused by such statements."

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 11–13 (1990) (quoting L. Eldredge, Law of Defamation

5 (1978)). As the Supreme Court has explained,

> [t]he common law of defamation is an oddity of tort law, for it allows recovery of
> purportedly compensatory damages without evidence of actual loss. Under the
> traditional rules pertaining to actions for libel, the existence of injury is presumed
> from the fact of publication. Juries may award substantial sums as compensation for
> supposed damage to reputation without any proof that such harm actually occurred.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974). At common law, defamatory publications

enabled a plaintiff "to require the defamer to prove the truth of the imputation or to concede its

falsity and establish the privileged character of the publication." Restatement (First) of Torts § 569

cmt. b (1938). This rule provided a path to vindication by letting a defamed plaintiff publicly brand

the defamatory publication as false. *Id.*; *see also Gertz*, 418 U.S. at 370–404 (White, J., dissenting);

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 765–774 (1985) (White, J.,

concurring). "The salutary social value of this [was] preventive in character since it often permit[ted]

a defamed person to expose the groundless character of a defamatory rumor before harm to the

reputation has resulted therefrom." Restatement (First) of Torts § 569 cmt. b. Consistent with this

vindicatory goal, actual harm to the plaintiff's reputation was unnecessary because the publication

*itself* was seen as an injury—"and therefore a sufficient ground for recovery of at least nominal damages." *Id.* cmt. c.[10]

The Restatement (Second) of Torts reinforces a defamed plaintiff's entitlement to nominal damages "when the insignificant character of the defamatory matter . . . leads the jury to believe that no substantial harm has been done to his reputation, and there is no proof that serious harm has resulted from the defendant's attack upon the plaintiff's character and reputation. Restatement (Second) of Torts § 620 cmt. a (1977). Nominal damages are awarded "when they are the only damages claimed, and the action is brought for the purpose of *vindicating* the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory matter." *Id.* (emphasis added).

To be sure, the law of defamation has evolved and been interpreted to have First Amendment implications in a long line of cases involving public official and public figure plaintiffs, media and non-media defendants, and matters of public concern. *See, e.g.*, *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986); *Gertz*, 418 U.S. 349; *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29 (1971); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967); *New York Times Co. v. Sullivan*, 376 U.S. 254

---

[10] In *Gertz*, the Supreme Court held that "[w]e need not define 'actual injury,' as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." 418 U.S. at 350. Florida law has adopted a similar understanding of the "injury" in a defamation claim. *See, e.g.*, *Miami Herald Pub. Co. v. Brown*, 66 So. 2d 679, 681 (1953) (reversing a judgment with directions to enter one for nominal damages where plaintiff failed to provide proof that his reputation suffered); *see also* Florida Standard Jury Instructions in Civil Cases, Substantive Instructions § 405.10 ("Defamation Damages") ("If you find for (defendant), you will not consider the matter of damages. But, if you find for (claimant), you should award (claimant) an amount of money that will fairly and adequately compensate (claimant) for such [loss] [injury] [or] [damage] as the greater weight of the evidence shows was caused by the [statement] [publication] in question. You shall consider the following elements of damage: *a. Injury to reputation or health; shame, humiliation, mental anguish, hurt feelings*: Any injury to reputation or health and any shame, humiliation, mental anguish, and hurt feelings experienced in the past [or to be experienced in the future]. There is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in the light of the evidence. . . . *f. Nominal damages*: If you find for (claimant) but find that no [loss] [injury] [or] [damage] has been proved, you [should] [may] award nominal damages. Nominal damages are damages of an inconsequential amount which are awarded to vindicate a right where a wrong is established but no damage is proved.").

(1964). But the effect of these decisions on cases involving private plaintiffs and private matters—cases that are ostensibly the most analogous to § 256 claims[11]—remains unclear. *See Bierman v. Weier*, 826 N.W.2d 436, 443 (Iowa 2013) ("In its constitutional decisions, [the Supreme Court] has seemingly cleared a path for traditional common law defamations claims to proceed when the plaintiff is a private figure and the defamation concerns private matters.").[12]

Amidst the confusion, at least two state supreme courts have recently held that common law libel presumptions still apply in defamation cases with private plaintiffs that do not involve matters of public concern. *See id.* at 448–53; *W.J.A. v. D.A.*, 43 A.2d 1148, 1160 (N.J. 2012).[13] In *Bierman*, the Iowa Supreme Court concluded that the United States Supreme Court "has never invalidated the

_____

[11] *See Bierman v. Weier*, 826 N.W.2d 436, 462 (Iowa 2013) "[P]urely private disputes such as a lawsuit in which the impact is limited primarily to the parties involved, even though perhaps of interest to the public, are insufficient to create a matter of public concern."

[12]  As one state supreme court justice recently noted:

Defamation law has long been viewed as complex, and that perception has only grown since the *New York Times* decision. As one commentator described: "The law of defamation is in disarray. It is confusing. It is unclear. Most critically, it fails to serve its most important objectives: providing an adequate remedy for reputational harm while allowing sufficient protection for speech. The chaotic nature of defamation law is primarily due to the fact that, at present, defamation involves a juxtaposition of two bodies of law: (1) the archaic state common law of libel and slander, a system arising from medieval roots, and (2) First Amendment jurisprudence, as developed by the courts following the United States Supreme Court's landmark *New York Times Co. v. Sullivan* decision in 1964. The latter body of law, of necessity, imposes only federal constitutional limitations on what remains essentially a state cause of action. As a result, the law of defamation resembles a creature fashioned by committee, or worse yet, one fashioned by several independent committees working in separate rooms in different eras with different blueprints—some building up and others chiseling down."

*Bierman*, 826 N.W.2d at 473 (Hecht, J., concurring in part and dissenting in part) (quoting Robert M. Ackerman, *Bringing Coherence to Defamation Law Through Uniform Legislation: The Search for an Elegant Solution*, 72 N.C. L. Rev. 291, 293 (1994)).

[13] Per the Iowa Supreme Court: "Iowa is not the only state to continue to apply common law per se presumptions in private plaintiff/private concern cases involving (at least) nonmedia defendants." *Bierman*, 826 N.W.2d at 455–56 (listing states); *see also W.J.A.*, 43 A.2d at 1158 (listing states and noting that the doctrine of presumed damages in a private citizen/private concern case has been abolished in several jurisdictions in favor of actual injury to reputation in all cases, but that the majority of states have retained the doctrine)

common law libel presumptions . . . to private plaintiff/private concern cases against nonmedia defendants." *Bierman*, 826 N.W.2d at 448. The opinion echoes rationale of the United States Supreme Court as to why the common law libel presumptions are useful:

> We believe that libel per se remains a useful rule in an area where it is often difficult for a plaintiff to prove actual damages[.] "The rationale of the common-law rules has been the experience and judgment of history that proof of actual damages will be impossible in a great many cases where, from the character of the defamatory words and the circumstances of publication, is it all but certain that serious harm has resulted in fact. As a result, courts for centuries have allowed juries to presume that some damage occurred from many defamatory utterances and publications."

*Id.* at 454 (quoting *Dun & Bradstreet, Inc.*, 472 U.S. at 760–61). In *W.J.A. v. D.A.*, and similarly consistent with the common law rationale, the New Jersey Supreme Court held that "[w]here a plaintiff does not proffer evidence of actual damage to reputation, the doctrine of presumed damages permits him to survive a motion for summary judgment and to obtain nominal damages, *thus vindicating his good name.*" *W.J.A.*, 43 A.2d at 1150 (emphasis added). The court later reasoned that, "in a defamation case, vindication is a significant part of the analysis. A trial, even one with only nominal damages awarded, will establish that a defendant's allegations against a plaintiff were false." *Id.* at 1159. A specially concurring Justice in *Bierman* made the point succinctly:

> I believe the only way a defamed person can definitely vindicate his or her reputation is to bring an action against the defamer. When a defamatory act gives rise to a per se claim, we should not require the defamed person to prove damages in order to vindicate his or her name. This is true for two reasons. First, in many cases, damages may be impossible to prove, and thus many per se cases would never be resolved. Second, a jury award of one dollar vindicates the defamed person's reputation, a remedy far superior to any dollar amount a jury might award.

*Bierman*, 826 N.W.2d at 467 (Wiggins, J., concurring specially).

### ii. Why the rationale of defamation law applies here

Requiring Dr. Krauser to prove some kind of concrete financial or economic harm to

establish standing for a reputational injury is tantamount to requiring a defamed plaintiff to prove actual damages to state his claim. Notwithstanding the First Amendment implications that are now a part of the law of defamation, it is clear that at common law actual damages were not necessary for a successful defamation claim. The common law recognized that a man's reputation was possibly his most valuable asset, that vindicating that reputation in the face of one who sought to defame it was of paramount importance, and that such vindication need not unnecessarily punish the defamer because a judgment in favor of the plaintiff that simply established the falsity of the defamation—and nothing more—was vindication enough.[14]

While the First Amendment protections established by the Supreme Court serve the constitutional guarantee of free and uninhibited discussion of public issues, in defamation cases that guarantee has always been balanced against society's "pervasive and strong interest in preventing and redressing attacks upon reputation." *Milkovich*, 497 U.S. at 22; *see also Gertz*, 418 U.S. at 342 ("Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury."). In the case of an inventor seeking to protect his

---

[14] As Justice Stevens once wrote in dissent, "[t]he individual's right to the protection of his own good name reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. . . . Indeed, vindicating one's reputation is the main interest at stake in a defamation case, and that interest has always been held to constitute a sufficient personal stake." *Spencer v. Kemna*, 523 U.S. 1, 24 n.5 (1998) (Stevens, J., dissenting) (citations and quotations omitted). In *Spencer*, Justice Stevens cited to his own majority opinion in *Meese v. Keene* for the proposition that the Supreme Court had already held that "an interest in one's reputation is sufficient to confer standing . . . ." *Spencer*, 523 U.S. at 24 n.6 and accompanying text. *Meese* involved a plaintiff attorney and member of the California State Senate who wanted to exhibit three Canadian films that had been identified as "political propaganda" under a federal statute. The plaintiff brought suit to enjoin application of the statute to the films, and the district court held that the risk of damage to the plaintiff's reputation "established his standing to challenge the constitutionality of the statute's use of the term 'propaganda' . . . ." *Meese v. Keene*, 481 U.S. 465, 468 (1987). The Supreme Court agreed, recognizing that the plaintiff had standing on the basis of the damage to his professional and personal reputation that would result from showing films categorized as "political propaganda." *Id.* at 472–77. While the Court may have considered evidence of reputational injury in reaching its conclusion as to standing based on reputation, *see id.* at 473–74 & nn.7–8, this Court concludes that, for reasons set forth below, such evidence is unnecessary to establish standing under Article III for purposes of § 256.

18

professional name through correction of inventorship, that balance shifts in favor of society's interest in redressing damage upon reputation. And this shift is due to the importance of protecting inventors' reputations as much as it is due to the minimal service to the First Amendment that would be engendered by a rule prohibiting inventors—who seek nothing more than reputational vindication—from bringing actions for correction of inventorship.[15]

### iii. Conclusion

Dr. Krauser has a vindicatory interest in correcting inventorship because, consistent with common law rationale, an erroneous patent application is *itself* an injury to his reputation sufficient to confer Article III standing. He need not prove any concrete financial or economic injury to vindicate his reputation because, as in most defamation cases, such injuries will generally be impossible to prove, and success on the § 256 inventorship claim serves a vindicatory purpose even if there is no concrete injury to be redressed. To hold otherwise would mean that the *true* inventor of a product who lacked any economic or ownership interest in his product would have no means of redress. Notwithstanding the contrary case law set forth above, this Court finds such a result untenable.

Because the Court concludes that (1) the declaratory judgment exception applies in this case, (2) being estopped from asserting *ownership* in the patents does not preclude Dr. Krauser from seeking correction of inventorship, and (3) Dr. Krauser's reputational interest confers Article III

---

[15] In the language of defamation: a patent application listing a party as inventor boldly states that "anyone else who claims to be the inventor of this patent is a liar." By extension, implicit in any correction-of-inventorship claim are competing statements that "the other party is a liar." One of the parties is right, of course, because the law of inventorship tells us that the identity of an inventor can be objectively ascertained. Of course, one of the parties is also wrong—and there is "no constitutional value in false statements of fact" such as "so-and-so is a liar" because "[n]either the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *See Gertz*, 418 U.S. at 340 (citing *New York Times Co.*, 376 U.S. at 270).

standing, only Defendant Evollution's challenge to personal jurisdiction remains. This challenge is

comprised of two prongs: first, that Evollution is not subject to personal jurisdiction in Florida; and

second, that rather than dismissing Evollution, the Court should exercise its discretion and transfer

this action to the District of Delaware where both defendants are subject to personal jurisdiction.[16]

For the reasons that follow, the Court concludes that Evollution is not subject to personal jurisdiction

in Florida, but the Court declines to exercise its discretion and transfer this action to the District of

Delaware.

## IV. Personal Jurisdiction

The exercise of personal jurisdiction by a federal district court in Florida over a nonresident

defendant consists of a two-part inquiry: (1) whether Florida's long-arm statute permits service of

process; and (2) whether the assertion of personal jurisdiction violates due process. *See Fraser v.*

*Smith*, 594 F.3d 842, 846 (11th Cir. 2010).

> The plaintiff's burden in alleging personal jurisdiction requires that the plaintiff
> establish a prima facie case of personal jurisdiction over a nonresident defendant. A
> prima facie case is established if the plaintiff presents enough evidence to withstand
> a motion for directed verdict. The district court must accept the facts alleged in the
> complaint as true, to the extent they are uncontroverted by the defendant's affidavits.
> If by defendant's affidavits or other competent evidence, defendant sustains the
> burden of challenging plaintiff's allegations, the plaintiff must substantiate the
> jurisdictional allegations in the complaint by affidavits, testimony or documents.
> However, where the evidence conflicts, the district court must construe all reasonable
> inferences in favor of the plaintiff.

*Vision Media TV Grp., LLC v. Forte*, 724 F. Supp. 2d 1260, 1263–64 (S.D. Fla. 2010) (citations

omitted). The Court first turns to Florida's long-arm statute to determine whether a Florida court

could exercise jurisdiction over Defendant Evollution in this case. *See Fraser*, 594 at 846 (citing

---

[16] Evollution seeks a transfer of this action notwithstanding the undisputed fact that BioHorizons is subject to personal jurisdiction in Florida.

*Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626–27 (11th Cir. 1996)).

Dr. Krauser alleges that Evollution is subject to both specific and general personal jurisdiction in Florida. (Am. Compl. ¶ 3). The relevant provisions of Florida's long-arm statute provide:

> (1)(a) A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:
>
> > 1. Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
> >
> > 2. Committing a tortious act within this state.
> >
> > 3. Owning, using, possessing, or holding a mortgage or other lien on any real property within this state.
> >
> > 4. Contracting to insure a person, property, or risk located within this state at the time of contracting.
> >
> > 5. With respect to a proceeding for alimony, child support, or division of property in connection with an action to dissolve a marriage or with respect to an independent action for support of dependents, maintaining a matrimonial domicile in this state at the time of the commencement of this action or, if the defendant resided in this state preceding the commencement of the action, whether cohabiting during that time or not. This paragraph does not change the residency requirement for filing an action for dissolution of marriage.
> >
> > 6. Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
> >
> > > a. The defendant was engaged in solicitation or service activities within this state; or
> > >
> > > b. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state

in the ordinary course of commerce, trade, or use.

7. Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.

8. With respect to a proceeding for paternity, engaging in the act of sexual intercourse within this state with respect to which a child may have been conceived.

9. Entering into a contract that complies with s. 685.102.

. . .

(2) A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.

Fla. Stat. §§ 48.193(1)(a), (2) (2013).

Dr. Krauser suggests that the Court can exercise (presumably specific) personal jurisdiction over Evollution because Evollution has purposefully availed itself of the privilege of conducting activities in Florida through its relationship with BioHorizons.[17] According to Dr. Krauser, this

_____

[17] The relevant allegations of Dr. Krauser's Amended Complaint are as follows:

3. This court has personal jurisdiction over the Defendants pursuant to Fla. Stat. Ch. 48.193(1)(a) and (2), in that they are, upon belief, personally or through an agent, operating, conducting, engaging in or carrying on a business or business venture this State [sic]; and/or engaged in substantial and not isolated activity within this State.

4. Evollution licenses intellectual property on an exclusive basis to [BioHorizons], including, upon belief, the patents which are the subject of this action. [BioHorizons] is currently registered to do business in, and does business in Florida through the sale of products embodying, in whole or part, the inventions contained in the patents which are the subject of this action.

5. Upon belief, Evollution has no other purpose than holding and licensing such intellectual property, including for the benefit of [BioHorizons]. Evollution is a wholly owned subsidiary of BioHorizons, Inc.[, an entity not a party to this action.] [BioHorizons, a defendant in this action,] is also a wholly owned subsidiary of BioHorizons, Inc. Evollution previously stipulated to submission to the jurisdiction of this Court [in Case No. 10-CV-80454-KAM].

6. [An entity named Orthogen Corporation, which is the previous owner of the one of patents at issue in this case,] is a wholly owned subsidiary of BioLok International, Inc., which was a [defendant in

"purposeful availment" arises out of out Evollution's licensing agreement with BioHorizons because the agreement "apparently extends beyond royalty or cross-licensing payment, including granting both parties the right to litigate infringement cases relating to the patents-in-suit and Evollution's authorizing [BioHorizons] to use its trademark in the marketing and distribution of the products . . . ." (DE 47 at 19). The Court rejects Dr. Krauser's position.

Through a declaration of one of its officers, Evollution established, among other things, the following:

- Evollution is a corporation organized under the laws of the State of Delaware.
- Evollution is a wholly-owned subsidiary of a corporation also organized under the laws of the State of Delaware.
- The only business Evollution has ever engaged in is the ownership of certain patent and trademark rights and related intellectual property, and licensing those rights on an exclusive basis to Defendant Biohorizons.
- Evollution has never been qualified or authorized to do business in the State of Florida.
- Evollution does not maintain, nor has it ever maintained, any office or place of business in the State of Florida.
- Evollution does not own or lease, nor has it ever owned or leased, any real or personal property in the State of Florida.
- Evollution has never designated an agent authorized to accept service of process on its behalf in the State of Florida.
- Evollution does not maintain, nor has it ever maintained, any telephone listing or post office box in the State of Florida.
- Evollution does not maintain, nor has it ever maintained, any bank account in the

Case No. 10-CV-80454-KAM, *see supra* note 4]. BioLok [International, Inc.] is a wholly owned subsidiary of BioLok Acquisition Corp., which is a wholly owned subsidiary of BioHorizons, Inc. In view of the number of corporate entities owned by Biohorizons, Inc., such as those referenced herein, as well as BioHorizons IPH, Inc., presently referenced on its website, and their apparent interrelationship, both to this action and [Case No. 10-CV-80454-KAM], [Dr. Krauser] believes that it may require further discovery as pertains to any challenge to personal jurisdiction in this action.

The Court notes that Evollution's previous stipulation to submission to the jurisdiction of this Court in Case No. 10-CV-80454-KAM, as alleged in paragraph 3, has no bearing on whether an exercise of jurisdiction over Evollution would be appropriate in *this* case, where no stipulation has been made. Evollution was not a defendant in the previous case, it never affirmatively sought the aid of this Court in the previous case, and it never defended the merits of the previous case. The Court accordingly concludes that this conduct does not constitute consent to jurisdiction and a waiver of any objection to personal jurisdiction by Evollution.

State of Florida.

- Evollution has never attended or participated in any trade show or other business events in the State of Florida.
- Evollution does not have, nor has it ever had, any employees, agents, or representatives in the State of Florida to conduct business on its behalf. Nor has any employee or agent of Evollution ever visited the State of Florida for purposes of soliciting or conducting any business on behalf of Evollution.
- Evollution has never manufactured, distributed, marketed, or advertised any product or service in the State of Florida (or anywhere else).
- Evollution has never entered into any agreement with Dr. Krauser or any other resident of the State of Florida, other than with its attorneys at the Florida law firm who represent Evollution in this litigation.

(DE 23: Dutil Decl. ¶¶ 3–19). This declaration sustained Evollution's burden of challenging Dr. Krauser's jurisdictional allegations, shifting the burden back to Dr. Krauser to "substantiate the jurisdictional allegations in the complaint by affidavits, testimony or documents." Dr. Krauser has failed to meet this burden because he has failed to produce any evidence in support of his jurisdictional claims.

The jurisdictional discovery conducted in this case supports the Court's conclusion. Dr. Krauser's initial request for this discovery was opposed by Evollution, but the parties ultimately agreed to limited discovery based on Dr. Krauser's opposition to Evollution's motion to dismiss. That discovery was to include the license agreement entered into between Defendants Evollution and BioHorizons, a related services agreement between those two companies, and copies of Evollution's certificate of incorporation and bylaws. (DE 49). A deposition of Evollution's officer, Mr. Dutil, was also to be conducted as part of the parties' agreement.

Upon completion of the jurisdictional discovery, Dr. Krauser advised the Court that "nothing further will be submitted by him, as regards the issue of personal jurisdiction over [Evollution]." (DE 51). Dr. Krauser elected not to depose Mr. Dutil, and the only discovery produced to the Court

24

was the license agreement between Evollution and BioHorizons, which Dr. Krauser has failed to establish supports the exercise of personal jurisdiction over Evollution.

As to specific jurisdiction, Dr. Krauser has not shown that Evollution purposefully availed itself of the privilege of conducting activities in Florida through its relationship with BioHorizons because he has not shown that the licensing agreement—the only evidence produced—supports that contention. Of course, as to General jurisdiction, a connection between Evollution's activities and Dr. Krauser's cause of action is not required. *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir. 2000). The "substantial and not isolated activity" requirement of the long-arm statute has been recognized by Florida courts as the functional equivalent of the continuous and systematic contact requirement for general jurisdiction under the Fourteenth Amendment Due Process Clause as discussed in *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 413–16 (1984); *see Woods v. Nova Cos. Belize, Ltd.*, 739 So. 2d 617, 620 (Fla. Dist. Ct. App. 1999); *Achievers Unlimited, Inc. v. Nutri Herb, Inc.*, 710 So. 2d 716, 720 (Fla. Dist. Ct. App. 1998). A finding that a defendant's activities satisfy section 48.193(2)'s requirements also necessitates a finding that minimum contacts exist. *See Universal Carribean Establishment v. Bard*, 543 So. 2d 447, 448 (Fla. Dist. Ct. App. 1989). Therefore, the analysis of jurisdiction under section 48.193(2) and the Due Process clause merge.

As there is no requirement of a connection between the defendant's activities and the cause of action, the Due Process requirements are more stringent for general personal jurisdiction than for specific personal jurisdiction. For the former, Due Process requires a showing of substantial, persistent, continuous, and systematic business contacts between the defendant and the forum state. *Helicopteros*, 446 U.S. at 414 nn.8, 9; *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207

F.3d 1351, 1357 n.4 (11th Cir. 2000); *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1274 (11th Cir.

2002). "The substantial connection between a defendant and the forum state must come about by an

action of the defendant purposefully directed toward the forum state." *Nida Corp. v. Nida*, 118 F.

Supp. 2d 1223, 1229 (M.D. Fla. 2000) (citing *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano

Cty.*, 480 U.S. 102, 108–09 (1987)). The defendant's contacts "must be so extensive to be

tantamount to [a defendant] being constructively present in the state to such a degree that it would

be fundamentally fair to require it to answer in [the forum state's courts] in any litigation arising out

of any transaction or occurrence taking place anywhere in the world." *Baker v. Carnival Corp.*, No.

06-21527-CIV-HUCK, 2006 WL 3360418, at *2 (S.D. Fla. Nov. 20, 2006) (citing *Purdue Research

Found. v. Sanofi Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir. 2003)). Dr. Krauser has not provided

any evidence that would support an exercise of general personal jurisdiction over Evollution.

  The cases cited by Dr. Krauser do not support an opposite conclusion. In *Dainippon Screen

Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266 (Fed. Cir. 1998), for example, the federal circuit

construed California's long-arm statute, which is "coextensive with the limits of due process"—so

the court never had to analyze a more restrictive state long-arm statute. *See id.* at 1270. Of course,

"Florida state courts have repeatedly held that the Florida statute requires more activities or contacts

to sustain personal jurisdiction than demanded by the Constitution. " *Mallard v. Aluminum Co. of

Canada, Ltd.*, 634 F.2d 236, 241 (5th Cir. 1981).[18] And in *Breckenridge Pharmaceutical, Inc. v.

Metabolife Laboratories, Inc.*, 444 F.3d 1356 (Fed. Cir. 2006), the requirements of subsection (1)(f)

of Florida's long-arm statute were met because the out-of-state defendant licensor sent letters that

could be construed as solicitations to Florida companies. *See id.* at 1361. Dr. Krauser cites

---

[18] *See supra* note 8.

*Breckenridge* for the proposition that a defendant licensor is subject to personal jurisdiction in the forum state "if the exclusive licensee (or licensee equivalent) with which it has established a relationship is not headquartered in the forum state, but nonetheless conducts business there." *Id.* at 1366; *see also* (DE 47 at 18). As Evolution correctly points out, however, that holding was directed to the due process analysis that followed the federal circuit's analysis of Florida's long-arm statute. Even if the Court accepted Dr. Krauser's argument, that acceptance would only compel a conclusion that the exercise of personal jurisdiction over Evollution comports with due process. Dr. Krauser has still failed to provide any support for the antecedent inquiry: whether the exercise of personal jurisdiction over Evollution comports with Florida's long-arm statute. In any event, the Court rejects Dr. Krauser's implicit suggestion that the *Breckenridge* holding even supports a conclusion that the exercise of personal jurisdiction over Evollution comports with due process.

In *Breckenridge*, the defendant licensor sent letters into the forum state (that the court presumed qualified as "cease and desist" letters); entered into an exclusive license with a company that, while not headquartered or incorporated in the forum state, conducted business there; granted the licensee the right to sue for patent infringement with written consent; agreed to "discuss in good faith the appropriate action, if any, with respect to third party infringers of [the licensed patents], and to cooperate reasonably in any enforcement actions"; granted the licensee "full control of the prosecution or maintenance" of any patent or application that the licensor abandoned or permitted to lapse and agreed to provide the licensee with an executed power of attorney for that purpose; and agreed to provide consultation to the licensee in the science, medicine, and marketing of related products from time to time. *See id.* at 1366–67. As the court described it, "[t]hat this exclusive license agreement not only *contemplated* an ongoing relationship between [the parties] beyond

27

royalty payments but has *actually resulted* in such a relationship is obvious from the facts of this case." *Id.* at 1367 (emphasis in original). The facts of Dr. Krauser and Evollution's case do not compel the same result because Dr. Krauser has failed to establish that Evollution derives revenue from Florida through the license agreement or otherwise directs BioHorizons' activities.

Dr. Krauser's failure to establish that the statutory requirements for either specific or general personal jurisdiction have been met precludes the assertion of personal jurisdiction over Evollution under Florida's long-arm statute. Thus, the Court need not address whether Evollution's contacts with Florida satisfy the requirements of Due Process. *See Fraser*, 594 F.3d at 848.

## V. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that  Defendants' Joint Motion to Dismiss or Transfer (DE 45) is **GRANTED in part and DENIED in part.** The motion is granted to the extent that Defendant Evollution is dismissed for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). The Court also concludes that the "interest of justice" does not require transferring this action to Delaware under 28 U.S.C. § 1406. *See Goldlawr, Inc. v. Heiman*, 369 U.S. 463 (1962). The Court's lack of personal jurisdiction over Evollution is not a sufficient reason to require Dr. Krauser to proceed against Biohorizons—over which the Court does have jurisdiction—in another venue which Dr. Krauser may find inconvenient. The remainder of the motion is denied for the reasons set forth above.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 19th day of September, 2013.

KENNETH A. MARRA
United States District Judge

28